DAVIS, Judge.
 

 David C. Sutton ("Defendant") appeals from an order of discipline entered by the Disciplinary Hearing Commission (the "DHC") of the North Carolina State Bar suspending his law license for a period of five years after determining that he had committed numerous violations of the North Carolina Rules of Professional Conduct. In addition to asserting challenges to various constitutional and procedural aspects of his disciplinary proceeding, Defendant argues on appeal that a number of the DHC's findings of fact were not supported by evidence in the record and that several of its legal conclusions were incorrect. After careful review, we affirm.
 

 *886
 

 Factual Background
 

 The State Bar initiated this disciplinary proceeding by filing a complaint on 3 April 2013. At all relevant times, Defendant, who was admitted to the North Carolina Bar in 2001, was engaged in the practice of law and maintained an office in Greenville, North Carolina. Defendant's disciplinary proceeding concerned allegations of misconduct by him that spanned multiple years and involved his representation of clients in a number of different cases.
 

 The matter was assigned to a hearing panel of the DHC on 23 April 2013. After an earlier amended complaint was filed, the DHC permitted the State Bar to file its second amended complaint on 4 December 2014.
 

 Disciplinary proceedings are divided into two phases: (1) the adjudicatory phase, during which the DHC determines whether the defendant has committed misconduct; and (2) the dispositional phase, during which the DHC determines the appropriate sanction for any misconduct that was found to exist.
 
 N.C. State Bar v. Talford
 
 ,
 
 356 N.C. 626
 
 , 636,
 
 576 S.E.2d 305
 
 , 312 (2003). The DHC received evidence and heard arguments in connection with the adjudicatory phase of the proceeding from 5-9 May and 9-11 June 2014. On 8 August 2014, the DHC issued its final findings and conclusions relating to the adjudicatory phase in which it determined that Defendant had committed 28 separate violations of the Rules of Professional Conduct.
 
 [1]
 

 The allegations against Defendant stemmed from his actions in seven specific matters during the course of his practice of law. The following is an overview of the facts relating to these matters and the accompanying findings of misconduct made by the DHC in connection with each of them.
 

 I. The Pollard Matter
 

 Defendant represented Barbara Pollard in a wrongful death lawsuit against her daughter-in-law in connection with the 2005 death of Pollard's son, Stacey Pollard. During Pollard's May 2011 deposition, which was taken by attorney Kathryn Fagan, Defendant repeatedly interjected his own questions and commentary, made sarcastic remarks, coached Pollard on how to respond to particular questions, and answered questions for Pollard. After the deposition had concluded, Defendant stated-in the presence of his client, the court reporter, and a law student in attendance-"Fagan, you know what your problem is? Your problem is that you need a boyfriend or a husband or something. ... I understand your client goes both ways so ... maybe you could have a little lickety-lick with her."
 
 [2]
 

 In connection with Defendant's representation of Pollard, a website (justice4stacey.com) was created in July 2007 to solicit information from members of the public who may have had knowledge relating to the death of Pollard's son. News articles were also posted on the website, and there was a section where members of the public could post public comments.
 

 In August 2011, Fagan filed a motion for a change of venue based on what she characterized as the "vilification" of her client resulting from the website, which she asserted was "sponsored" by Defendant. In response, Defendant filed an affidavit in which he falsely stated that he "did not 'sponsor' any website [.]" Defendant made this representation despite the fact that he (1) had taken part in discussions with Pollard's family regarding setting up the website; (2) was the initial registrant and administrator of the website and paid the web hosting fees; (3) possessed the password necessary to post materials on the website and did, in fact, post certain items; and (4) was listed as the website's
 
 *887
 
 contact person along with his email address and phone number.
 
 [3]
 

 II. The Langston Matter
 

 In 2011, Defendant represented Rita Langston in a family law case in which the opposing counsel was Brantley Peck, Jr. During Langston's May 2011 deposition, Defendant repeatedly interrupted Peck's questioning, provided testimony for Langston, and interjected his own questions. Defendant also accused Peck during the deposition of being "complicit" with theft and referred to one of Peck's statements as "a damn lie." Shortly after this attack, Defendant abruptly terminated the deposition and refused to allow Peck to complete his deposition of Langston.
 
 [4]
 

 Approximately one year later, Defendant made two false statements in connection with the Langston Matter. First, Defendant informed the court that a corporation formed by the parties in the case had been "aned" by North Carolina's Secretary of State because the opposing party had forged corporate documents. In reality, Defendant knew that the corporation had been administratively dissolved by the Secretary of State rather than dissolved because of fraud. Second, Defendant accused opposing counsel in open court of "slipping" a handwritten provision into a settlement agreement without Defendant's knowledge or approval when, in fact, Defendant knew about-and had actually agreed to-the added provision.
 
 [5]
 

 III. The Gorham Matter
 

 During a trial in Greene County Superior Court in 2012 at which Defendant was representing a defendant charged with murder, Judge Phyllis Gorham admonished Defendant for repeatedly failing to display respect for the court and to yield to its rulings. Later in the trial, with the jury present in the courtroom, Defendant approached the bench without having received permission and in a "loud and argumentative" tone accused the prosecutor of attempting to offer inadmissible evidence. He then noticeably grimaced at Judge Gorham. This behavior necessitated Judge Gorham calling a recess in order to address Defendant's behavior.
 
 [6]
 

 IV. The Davenport Matter
 

 In 2012, Defendant represented Jonathan Davenport in a dispute arising from a previous business relationship between Davenport and Billy Roughton. Davenport was ultimately charged by state and federal authorities with crimes arising from this business relationship. Defendant recorded, and then uploaded to YouTube, a video of an incident in which he confronted Pasquotank County Sheriff's Office Investigator Sam Keith, the investigating officer in Davenport's case, and accused the Sheriff's Office of engaging in criminal conduct by not handing over certain property to Davenport. Defendant later admitted that his purpose in uploading the video to YouTube was not to further his representation of Davenport but rather to be a "smart aleck."
 
 [7]
 

 The following day, Defendant sent a letter on behalf of Davenport directly to Roughton and the Sheriff of Pasquotank County accusing them of conspiring to violate Davenport's
 
 *888
 
 rights and engaging in malicious prosecution. At the time Defendant sent this letter-in which he demanded $3 million to settle the matter-he knew that both Roughton and the sheriff were represented by counsel.
 
 [8]
 

 V. The Shackley Matter
 

 In 2013, Defendant represented Norman Shackley on a charge of impersonating a law enforcement officer. In connection with the case, Defendant obtained by subpoena phone records from one of the State's witnesses, Jimmy Hughes. At 10:00 p.m. one evening, Defendant called a phone number listed in these records and told the person who answered the phone, Jean Sugg (whom Defendant did not know), that Hughes had "hit on" Shackley's wife, who had "big boobs" and ran a prostitute website.
 
 [9]
 

 VI. The Dolenti Matter
 

 Defendant defended a client charged with child abuse in 2013. Upon learning that the district attorney had refused to drop the charges against his client, Defendant left a voicemail for Detective Nikki Dolenti, the investigating officer in the case, in which he made the following statement in a harsh and threatening tone: "You obviously don't know what the hell you're doing. So I'm just gonna whoop your ass real bad next week unless you get your ass down there and get this case dismissed. And do your job and have some sense."
 
 [10]
 

 VII. The Deans Matter
 

 Defendant was arrested by the Pitt County Sheriff's Office as a result of his voicemail to Detective Dolenti. At the time, Defendant was representing the Pitt County Sheriff's daughter, Laura Deans, and son-in-law in an adoption proceeding that was set to be finalized within the month. Defendant, who was "mad as hell" and "wanted to get back at the [Sheriff]," left a voicemail with Deans stating that he had been handling her case "as a favor to your dad when I thought that he wasn't trying to f* * * me too, but I can't do that anymore, and I don't know that you need to be in my office or I need to have y'all around." Defendant also made explicit and crude comments during the voicemail regarding the sheriff, his wife, and the Pitt County district attorney.
 
 [11]
 

 During a subsequent phone call with Deans, Defendant demanded immediate payment of his fee-despite the lack of a prior agreement as to when his fee would be due-and refused to respond to Deans' questions regarding the status of the adoption or the steps she needed to take to finalize the adoption. Defendant ceased work on the case and did not have any further interaction with Deans.
 
 [12]
 

 * * * *
 

 After determining in its 8 August 2014 order that Defendant had violated the Rules of Professional Conduct in connection with the seven matters summarized above, the DHC held hearings from 16-18 September and 22-23 October 2014 for the dispositional
 
 *889
 
 phase of the proceeding during which it received additional evidence and heard arguments. On 13 November 2014, the DHC issued its Order of Discipline-upon which the present appeal is based-in which it (1) recited the violations of the Rules of Professional Conduct it had found in its 8 August 2014 order; (2) made additional findings of fact relating to the dispositional phase; and (3) imposed a five-year suspension of Defendant's law license.
 

 The extensive additional findings of fact in the Order of Discipline relating to the dispositional stage described numerous other instances of abusive, belligerent, threatening, and profane communications and conduct by Defendant-both inside and outside of the courtroom-that occurred between 2008 and 2014.
 
 [13]
 
 The Order of Discipline also noted numerous examples of
 

 a recurrent pattern in Defendant's practice of law. When Defendant believes someone with whom he interacts professionally is wrong about the facts, the law, procedure, or a matter of judgment, he demands instant redress. If the person with whom he disagrees does not immediately capitulate, Defendant threatens to harm that individual in some way.
 

 The Order of Discipline further noted numerous incidents demonstrating Defendant's penchant for "us[ing] graphic sexual commentary to embarrass and/or demean others in professional contexts." It also cited numerous instances showing that "in retaliation for perceived wrongs, [Defendant] is willing to breach his duty of loyalty to clients and former clients by disclosing confidential information and/or attempting to prejudice their interests." Finally, the Order of Discipline stated that
 

 [t]here is no indication that Defendant has taken ownership of his misconduct or its consequences. He has not acknowledged violating the Rules of Professional Conduct, expressed remorse, or shown any insight regarding his lack of professionalism. In his testimony during the discipline phase of this case, Defendant maintained that he didn't do anything wrong, has nothing to apologize for, and will continue to conduct himself in the same manner if permitted to continue practicing law.
 

 Defendant filed a timely notice of appeal on 10 December 2014.
 

 Analysis
 

 Defendant raises a variety of arguments on appeal, which can be organized into two general categories. First, he makes several constitutional and procedural arguments in connection with his disciplinary proceeding and the Order of Discipline. Second, he challenges the validity of certain findings of fact and conclusions of law made by the DHC in determining that he had violated the Rules of Professional Conduct. We address each category below.
 

 I. Standard of Review
 

 Pursuant to
 
 N.C. Gen. Stat. § 84-28
 
 , the DHC has the power to discipline any attorney admitted to practice law in the State of North Carolina upon determining that the attorney has violated the North Carolina Rules of Professional Conduct.
 
 N.C. Gen. Stat. § 84-28
 
 (b)(2) (2015). A party may appeal to this Court from a final order of the DHC.
 
 N.C. Gen. Stat. § 84-28
 
 (h).
 

 We review disciplinary orders of the DHC under the whole record test, which
 

 requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law[.] Such supporting evidence is substantial if a reasonable
 
 *890
 
 person might accept it as adequate backing for a conclusion.
 

 Talford
 
 ,
 
 356 N.C. at 632
 
 ,
 
 576 S.E.2d at 309-10
 
 (internal citation and quotation marks omitted). "Moreover, in order to satisfy the evidentiary requirements of the whole-record test in an attorney disciplinary action, the evidence used by the DHC to support its findings and conclusions must rise to the standard of clear, cogent, and convincing."
 
 Id.
 
 at 632,
 
 576 S.E.2d at 310
 
 (citation, quotation marks, and brackets omitted).
 

 The whole record test also mandates that "the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn."
 

 Id.
 

 However, "[t]he mere presence of contradictory evidence does not eviscerate challenged findings, and the reviewing court may not substitute its judgment for that of the DHC. The DHC determines the credibility of the witnesses and the weight of the evidence."
 
 N.C. State Bar v. Adams
 
 , --- N.C.App. ----, ----,
 
 769 S.E.2d 406
 
 , 411 (2015) (internal citation, quotation marks, and brackets omitted). Thus, "[t]he whole record test does not allow the reviewing court to replace the [DHC's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it
 
 de novo
 
 ."
 
 N.C. State Bar v. Nelson
 
 ,
 
 107 N.C.App. 543
 
 , 550,
 
 421 S.E.2d 163
 
 , 166 (1992) (citation and quotation marks omitted),
 
 aff'd per curiam
 
 ,
 
 333 N.C. 786
 
 ,
 
 429 S.E.2d 716
 
 (1993).
 

 II. Constitutional and Procedural Arguments
 

 A. Constitutionality of the DHC's Disciplinary Authority
 

 Defendant asserts that the Order of Discipline is and void because the "DHC encroaches on the judiciary and violates separation of powers" principles. In making this argument, Defendant directs our attention to Article III, Section 11 of the North Carolina Constitution, which states that
 

 all administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law among and within not more than 25 principal administrative departments so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department.
 

 N.C. Const. art. III, § 11. He then points to Article IV, Section 3, which provides that the "General Assembly may vest in administrative agencies established pursuant to law such judicial powers as may be reasonably necessary as an incident to the accomplishment of the purposes for which the agencies were created." N.C. Const. art. IV, § 3.
 

 Defendant contends that the State Bar-through the DHC-may not constitutionally exercise judicial power because it is not housed in one of the 25 principal departments referenced in Article III, Section 11. However, Defendant provides no authority for this assertion, and we fail to see how it
 
 could
 
 be supported, given that the same constitutional language he relies upon specifically states that "[r]egulatory [and] quasi-judicial ... agencies may,
 
 but need not
 
 , be allocated within a principal department."
 
 [14]
 
 N.C. Const. art. III, § 11 (emphasis added).
 

 We also find meritless Defendant's contention that the State Bar impermissibly encroaches on the power of North Carolina's Judicial Branch to impose discipline in cases involving attorney misconduct. Our Supreme Court has specifically held that the State Bar and the courts of North Carolina "share concurrent jurisdiction over matters of attorney discipline" and that "questions relating to the propriety and ethics of an attorney are ordinarily for the consideration of the North Carolina State Bar."
 
 N.C. State Bar v. Randolph
 
 ,
 
 325 N.C. 699
 
 , 701,
 
 386 S.E.2d 185
 
 , 186 (1989) (citation omitted). That concurrent jurisdiction does not undermine the "inherent powers of a court to deal with its attorneys."
 

 *891
 

 Id.
 

 (citation omitted). This Court has explained that
 

 under the system of concurrent jurisdiction over attorney conduct and discipline in effect in North Carolina, both the State Bar and the courts have an important role to play in assuring that attorneys conduct themselves properly, with the courts focusing on protecting themselves from fraud and impropriety and serving the ends of the administration of justice, while the State Bar has responsibility for the broad range of questions relating to the propriety and ethics of an attorney, and with neither to act in such a manner as to disable or abridge the powers of the other.
 

 Cunningham v. Selman
 
 ,
 
 201 N.C.App. 270
 
 , 284,
 
 689 S.E.2d 517
 
 , 526 (2009) (internal citations, quotation marks, and brackets omitted).
 

 Defendant provides no basis for his assertion that the State Bar's actions in the present case usurped the role of North Carolina's judiciary in regulating attorney misconduct. Accordingly, we overrule Defendant's argument on this issue.
 

 B. Due Process
 

 In his brief, Defendant makes the sweeping assertion that the entire disciplinary "process was biased and void of fairness and due process and must be vacated." In support of this contention, Defendant expresses his disagreement with various witnesses' testimony, actions of the State Bar, statements of DHC members, and rulings of the DHC.
 

 However, because Defendant fails to provide any substantive arguments or legal authority supporting his contention that the proceeding as a whole violated his right to due process on account of bias or unfairness, we deem this issue abandoned pursuant to Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure.
 
 See
 
 N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.");
 
 N.C. State Bar v. Ethridge
 
 ,
 
 188 N.C.App. 653
 
 , 668,
 
 657 S.E.2d 378
 
 , 387 (2008) ("[D]efendant fails to cite any authority for his assignments of error regarding DHC's failure to properly weigh the aggravating and mitigating factors. As such, these assignments of error are deemed abandoned pursuant to N.C.R. App. P. 28(b)(6) [.]").
 

 Moreover, based on our own thorough review of the extensive record in this case, we are satisfied that the DHC conducted a fair and unbiased process that fully comported with principles of due process. Defendant was given proper notice of the allegations against him; he was allowed access to the evidence supporting these allegations; he was permitted to call his own witnesses, introduce evidence, and cross-examine opposing witnesses; and he was able to file motions and make legal arguments. This disciplinary action spanned one-and-a-half years and produced a record exceeding 10,000 pages. The DHC ruled on numerous motions filed by Defendant and issued orders containing extensive and detailed findings of fact and conclusions of law. Therefore, the record belies Defendant's assertion that he was denied due process in connection with his disciplinary proceeding.
 

 C. Freedom of Speech
 

 Defendant next makes the broad assertion that the Rules of Professional Conduct are unconstitutional-either facially or as applied to him-to the extent that they allowed him to be punished for speech that is protected by the First Amendment to the United States Constitution.
 
 [15]
 
 However, Defendant fails to make any particularized arguments as to which rules he specifically believes are either facially unconstitutional or have been unconstitutionally applied to him. As such, he has waived his right to appellate review of this issue by failing to satisfy his burden as the appellant in this appeal to show a specific deprivation of his legal rights.
 
 See
 

 State v. Billups
 
 ,
 
 301 N.C. 607
 
 , 616,
 
 272 S.E.2d 842
 
 , 849 (1981) ("[T]he appellant must
 
 *892
 
 show error positive and tangible, that has affected his rights substantially and not merely theoretically, and that a different result would have likely ensued." (citation and quotation marks omitted)).
 

 Nevertheless, we take this opportunity to reject Defendant's categorical assertion that the First Amendment provides attorneys with blanket immunity from facing disciplinary sanctions for violating the ethical rules applicable to lawyers in North Carolina simply because those violations involve some form of speech. As a general proposition, the First Amendment does not immunize an attorney from being disciplined for violating the Rules of Professional conduct simply because the attorney employs "speech" in committing the violations. As with all constitutional rights, the right to free speech is not absolute.
 

 As our Supreme Court has stated,
 

 [f]reedom of speech is not an unlimited, unqualified right. Speech may be subordinated to other values and considerations, and may be reasonably restrained as to time and place. It is well settled that, within proper limits, the right of free speech is subject to legislative restriction when such restriction is in the public interest. ... The constitutional right of freedom of speech does not extend ... to every use and abuse of the spoken and written word.
 

 State v. Leigh
 
 ,
 
 278 N.C. 243
 
 , 250,
 
 179 S.E.2d 708
 
 , 712 (1971) (internal citation omitted).
 

 Indeed, the United States Supreme Court has recognized that certain restrictions on speech apply uniquely to attorneys.
 

 It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal.
 
 Even outside the courtroom, a majority of the Court in two separate opinions [has] observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be.
 

 Gentile v. State Bar of Nev.
 
 ,
 
 501 U.S. 1030
 
 , 1071,
 
 111 S.Ct. 2720
 
 , 2743,
 
 115 L.Ed.2d 888
 
 , 921 (1991) ;
 
 see, e.g.
 
 ,
 

 id.
 

 at 1073
 
 ,
 
 111 S.Ct. at 2744
 
 ,
 
 115 L.Ed.2d at 922
 
 (noting that in cases relating to regulation of advertising the Supreme Court has "not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses");
 
 Sheppard v. Maxwell
 
 ,
 
 384 U.S. 333
 
 , 363,
 
 86 S.Ct. 1507
 
 , 1522,
 
 16 L.Ed.2d 600
 
 , 620 (1966) (explaining that "[c]ollaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures").
 

 In balancing the First Amendment rights of attorneys against the ability of states to discipline attorneys for unethical conduct, courts are to "engage[ ] in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue."
 
 Gentile
 
 ,
 
 501 U.S. at 1073
 
 ,
 
 111 S.Ct. at 2744
 
 ,
 
 115 L.Ed.2d at 922
 
 . The Supreme Court has explained that "[s]tates have a compelling interest in the practice of professions within their boundaries, and as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."
 
 Fla. Bar v. Went For It, Inc
 
 .,
 
 515 U.S. 618
 
 , 625,
 
 115 S.Ct. 2371
 
 , 2376,
 
 132 L.Ed.2d 541
 
 , 550 (1995) (citation, quotation marks, and ellipses omitted).
 

 Moreover, "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' "
 
 Goldfarb v. Va. State Bar
 
 ,
 
 421 U.S. 773
 
 , 792,
 
 95 S.Ct. 2004
 
 , 2016,
 
 44 L.Ed.2d 572
 
 , 588 (1975) (citation omitted). As such, the Supreme Court has recognized the substantial interest possessed by states both in "protect[ing] the integrity and fairness of a State's judicial system,"
 
 Gentile
 
 ,
 
 501 U.S. at 1075
 
 ,
 
 111 S.Ct. at 2745
 
 ,
 
 115 L.Ed.2d at 923
 
 , and in "protect[ing] the flagging reputations of ... lawyers by preventing them from engaging
 
 *893
 
 in conduct that ... is universally regarded as deplorable and beneath common decency ... [,]"
 
 Went For It
 
 ,
 
 515 U.S. at 625
 
 ,
 
 115 S.Ct. at 2376
 
 ,
 
 132 L.Ed.2d at 550
 
 (quotation marks omitted).
 

 We recognize that the precise contours of the restrictions that the First Amendment imposes on the power of states to regulate attorney speech are not always clear. However, judicial resolution of such questions may only occur in cases where, unlike here, the issues have been properly presented to the court.
 

 D. Assistance of Co-counsel
 

 Defendant next contends that the DHC violated his right to counsel by granting the State Bar's motion that he be required to choose between either representing himself or being represented by counsel. At the beginning of his disciplinary proceeding, Defendant attempted to simultaneously represent himself
 
 and
 
 employ the assistance of co-counsel. The DHC ruled that Defendant would have to choose between proceeding
 
 pro se
 
 or, alternatively, being represented by counsel.
 

 According to
 
 N.C. Gen. Stat. § 1-11
 
 , "[a] party may appear either in person or by attorney in actions or proceedings in which he is interested."
 
 N.C. Gen. Stat. § 1-11
 
 (2015). Our Supreme Court has construed this provision to mean that a litigant "has no right to 'appear' both by himself and by counsel."
 
 Hamlin v. Hamlin
 
 ,
 
 302 N.C. 478
 
 , 482,
 
 276 S.E.2d 381
 
 , 384-85 (1981). While Defendant argues that this general rule should be modified when the party is an attorney, he cites no legal authority for this position, and we have been unable to locate any caselaw that would support his argument. Accordingly, we conclude that the DHC's ruling on this issue was proper.
 

 E. Amendment to Complaint
 

 Defendant also contends that the DHC improperly allowed the State Bar to file a second amended complaint containing additional allegations that were not sufficiently related to the allegations in the original complaint. The motion seeking leave to file the second amended complaint was filed on 4 November 2013, and it was granted on 3 December 2013 without any response from Defendant having been filed. The DHC heard evidence relating to the new allegations during the hearings for the adjudicatory phase, which concluded on 11 June 2014. Defendant did not raise any challenge to this amendment until 6 August 2014-approximately eight months after the motion to amend was granted and almost two months after the DHC concluded its evidentiary hearings on all of the allegations, including those contained in the second amended complaint.
 

 Unless an issue is automatically preserved by law, "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a
 
 timely
 
 request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1) (emphasis added). Defendant has presented no legal authority supporting the proposition that this issue was automatically preserved or was preserved by his untimely objection filed months after the motion to amend was filed and granted. Accordingly, we hold that due to his failure to raise a timely objection to the filing of the second amended complaint, Defendant has waived his right to appellate review of this issue.
 
 See
 

 N.C. State Bar v. Beaman
 
 ,
 
 100 N.C.App. 677
 
 , 684,
 
 398 S.E.2d 68
 
 , 72 (1990) (because "no objection to the State Bar's motion to amend its complaint to include [the defendant]'s alleged violation of Rule 1.2(D) was made and ... his alleged violation of this rule was argued before the Committee ... [,] the issue will be treated as being properly pled").
 

 F. Signatures on Complaints
 

 Defendant next argues that the DHC lacked subject matter jurisdiction because the chairperson of the State Bar's Grievance Committee did not physically sign the original complaint or the second amended complaint. According to the State Bar Discipline and Disability Rules, once the Grievance Committee has determined that probable cause exists to believe that a violation of the Rules of Professional Conduct has occurred, a formal complaint is filed.
 

 *894
 
 27 N.C. Admin. Code 1B.0113(a). "Formal complaints will be issued in the name of the North Carolina State Bar as plaintiff and signed by the chairperson of the Grievance Committee. Amendments to complaints may be signed by the counsel alone, with the approval of the chairperson of the Grievance Committee." 27 N.C. Admin. Code 1B.0113(n).
 

 Here, the original complaint contained a digital image of the signature of the then-chairperson of the Grievance Committee, Margaret M. Hunt. That complaint, as well as the second amended complaint, also bore the signatures of counsel for the State Bar.
 
 [16]
 
 Defendant has cited to no legal authority providing that it was impermissible for the Grievance Committee chairperson to use an electronic reproduction of her signature on the initial complaint.
 

 Indeed, our Supreme Court has explained that "public documents may be authenticated by mechanical reproduction of the signature of the authorized officer when he intends to adopt the mechanical reproduction as his signature."
 
 State v. Watts
 
 ,
 
 289 N.C. 445
 
 , 449,
 
 222 S.E.2d 389
 
 , 392 (1976) ;
 
 see
 

 id.
 

 at 448
 
 ,
 
 222 S.E.2d at 391
 
 ("[I]n legal contemplation 'to sign' means to attach a name or cause it to be attached by any of the known methods of impressing the name on paper with the intention of signing it."). Accordingly, we reject Defendant's argument that subject matter jurisdiction was lacking simply because Hunt signed the original complaint by means of an electronic signature.
 
 [17]
 

 G. Notice of Factors to be Considered at Dispositional Phase
 

 Defendant also argues that he was not provided advance "notice of the aggravating factors that the [State] Bar intended to use against him" during the dispositional phase of the proceeding. Pursuant to the Discipline and Disability Rules, "[i]f the charges of misconduct are established, the hearing panel will then consider any evidence relevant to the discipline to be imposed." 27 N.C. Admin. Code 1B.0114(w). These rules, in turn, list factors that the DHC is to consider in all cases,
 
 see
 
 27 N.C. Admin. Code 1B.0114(w)(3), as well as additional factors to be considered in cases where the DHC imposes a sanction of disbarment or suspension,
 
 see
 
 27 N.C. Admin. Code 1B.0114(w)(1).
 

 Defendant provides no authority-nor have we found any-in support of his contention that the State Bar was required to notify him in advance of which
 
 particular
 
 factors in 27 N.C. Admin. Code 1B.0114(w) it planned to argue were relevant at the dispositional phase. Moreover, the statute itself gave Defendant notice of the list of factors that the State Bar could rely upon. We note that Defendant does not dispute that he received in discovery notice of all the facts the State Bar sought to establish in both the adjudicatory and dispositional phases of the proceedings. Accordingly, we do not find merit in Defendant's argument on this issue.
 

 H. Adequacy of Findings and Conclusions at Dispositional Phase
 

 In addition, Defendant contends that the DHC never provided him with adequate reasons for the sanction it imposed against him and that the DHC acted improperly in largely adopting the proposed findings and conclusions submitted by the State Bar.
 

 In imposing a disciplinary sanction, the DHC must support its "choice with written findings that ... are consistent with the statutory scheme of N.C.G.S. § 84-28 [.]"
 
 Talford
 
 ,
 
 356 N.C. at 638
 
 ,
 
 576 S.E.2d at 313
 
 .
 
 N.C. Gen. Stat. § 84-28
 
 provides five levels of punishment for attorney misconduct: disbarment, suspension, censure, reprimand, and admonition.
 
 N.C. Gen. Stat. § 84-28
 
 (c). Our Supreme Court has explained that the statutory scheme set out in
 
 N.C. Gen. Stat. § 84-28
 
 "clearly evidences an intent to punish attorneys in an escalating fashion keyed to: (1) the harm or potential harm created by the attorney's misconduct, and (2) a demonstrable
 
 *895
 
 need to protect the public."
 
 Talford
 
 ,
 
 356 N.C. at 637-38
 
 ,
 
 576 S.E.2d at 313
 
 (emphasis omitted). Furthermore,
 

 in order to merit the imposition of suspension or disbarment, there must be a clear showing of how the attorney's actions resulted in significant harm or potential significant harm to [a client, the administration of justice, the profession, or members of the public], and there must be a clear showing of why suspension and disbarment are the only sanction options that can adequately serve to protect the public from future transgressions by the attorney in question. ... Thus, upon imposing a given sanction against an offending attorney, the DHC must provide support for its decision by including adequate and specific findings that address these two key statutory considerations.
 

 Id.
 
 at 638,
 
 576 S.E.2d at 313
 
 (quotation marks and emphasis omitted).
 

 Here, the dispositional portion of the Order of Discipline included (1) extensive factual findings as to Defendant's actions that clearly caused significant-or potentially significant-harm to clients, the administration of justice, the profession, and members of the public;
 
 [18]
 
 (2) conclusions of law regarding the specific factors set forth in 27 N.C. Admin. Code 1B.0114(w) relevant to this case; and (3) an explanation as to why a five-year suspension was the least severe sanction necessary to protect the public from future transgressions by Defendant.
 

 On this last point, the DHC stated the following in its Order of Discipline:
 

 7. Defendant's persistent pattern of misconduct up through and including his actions in this disciplinary proceeding indicate that Defendant is either unwilling or unable to conform his behavior to the requirements of the Rules of Professional Conduct. Defendant refuses to acknowledge the wrongfulness of his conduct and stated that he does not intend to modify his behavior. Accordingly, if Defendant were permitted to continue practicing law, he would pose a significant risk of continued harm to clients, the profession, the public, and the administration of justice.
 

 8. The Hearing Panel finds that admonition, reprimand, or censure would not be sufficient discipline because of the gravity of the harm to the administration of justice and to the legal profession in the present case. Furthermore, the Panel finds that any sanction less than suspension would fail to acknowledge the seriousness of the offenses committed by Defendant, would not adequately protect the public, and would send the wrong message to attorneys and the public regarding the conduct expected of members of the Bar in this State.
 

 9. Notwithstanding repeated prior warnings about the impropriety of his conduct and an attempt to reform his behavior through mentoring, Defendant exhibits escalating misconduct and a wholly unrepentant attitude. Accordingly, the protection of the public requires that Defendant be required to demonstrate rehabilitation and reformation before he may be permitted to resume practicing law.
 

 10. The Hearing Panel finds and concludes that the public can only be adequately protected by an active suspension of Defendant's law license, with reinstatement to the practice of law conditioned upon a showing of reformation and other reasonable conditions precedent to reinstatement.
 

 *896
 
 Defendant also asserts that the Order of Discipline is deficient because many of its findings were taken verbatim from the proposed order of discipline submitted by the State Bar. Defendant asserts that such action amounts to an abdication of the DHC's authority. We are not persuaded.
 

 It is the accepted practice in North Carolina for the prevailing party to draft and submit a proposed order that the decision-making body may then issue as its own-with or without amendments.
 
 See, e.g.
 
 ,
 
 In re J.B
 
 .,
 
 172 N.C.App. 1
 
 , 25,
 
 616 S.E.2d 264
 
 , 279 (2005) ("Nothing in the statute or common practice precludes the trial court from directing the prevailing party to draft an order on its behalf.");
 
 Farris v. Burke Cty. Bd. of Educ.
 
 ,
 
 355 N.C. 225
 
 , 242,
 
 559 S.E.2d 774
 
 , 784 (2002) (upholding propriety of school superintendent's counsel preparing findings of fact to be adopted by board of education and noting that "[s]imilar procedures are routine in civil cases, where a judge is permitted to ask the prevailing party to draft a judgment");
 
 Johnson v. Johnson
 
 ,
 
 67 N.C.App. 250
 
 , 257,
 
 313 S.E.2d 162
 
 , 166 (1984) ("The trial judge properly directed the attorney for the [prevailing party] to prepare proposed findings and conclusions and draft the judgment, and adopted the judgment as his own when tendered and signed.").
 

 Here, Defendant has not directed our attention to any applicable statute or regulation prohibiting the DHC from adopting the proposed findings and conclusions submitted by the State Bar. Accordingly, he has failed to show error. Moreover, we conclude that the DHC fully complied with the requirements of
 
 N.C. Gen. Stat. § 84-28
 
 in imposing its sanction in this case.
 

 I. Assessment of Fees and Costs
 

 Defendant next asserts that the DHC erred in assessing fees and costs against him in the amount of $35,315.95. However, because Defendant neither cites to any legal authority in support of this argument nor explains why he believes the amount of fees and costs assessed was unreasonable, we deem this issue waived pursuant to Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure.
 
 See
 

 Ethridge
 
 ,
 
 188 N.C.App. at 668
 
 ,
 
 657 S.E.2d at 387
 
 (holding that because "defendant fail[ed] to cite any authority" for certain assignments of error, those "assignments of error are deemed abandoned pursuant to N.C.R. App. P. 28(b)(6) ").
 
 [19]
 

 III. Challenges to Factual Findings and Conclusions of Law
 

 Having rejected all of Defendant's constitutional and procedural arguments, we next turn our attention to Defendant's specific challenges to the DHC's findings of fact and conclusions of law as to each of the seven matters summarized earlier in this opinion that formed the basis for his disciplinary proceeding. We address in turn each of Defendant's arguments regarding these seven matters.
 

 A. The Pollard Matter
 

 Defendant contends that the DHC's findings of fact do not support its conclusion of law that his behavior during the deposition of Pollard constituted "conduct intended to disrupt a tribunal" in violation of Rule 3.5(a)(4) because the deposition did not constitute a "tribunal." Defendant asserts that depositions were only included within the meaning of the term "tribunal" by virtue of a 2015 amendment to the Rules of Professional Conduct such that a deposition could not properly have been considered a "tribunal" at the time of Pollard's 2011 deposition.
 

 However, at the time of Pollard's deposition, the official commentary to the Rules of Professional Conduct stated, in pertinent part, that "[t]he duty to refrain from disruptive conduct applies to any proceeding of a tribunal,
 
 including a deposition
 
 ." N.C. Rev. R. Prof. Conduct 3.5, cmt. 10 (2011) (emphasis
 
 *897
 
 added). "The Comment accompanying each Rule [of Professional Conduct] explains and illustrates the meaning and purpose of the Rule." N.C. Rev. R. Prof. Conduct 0.2 [8]. As such, the official commentary does "not add obligations to the Rules but provide[s] guidance for practicing in compliance with the Rules." N.C. Rev. R. Prof. Conduct 0.2 [1].
 

 This Court has previously utilized the commentary to the Rules of Professional Conduct in construing their meaning.
 
 See, e.g.
 
 ,
 
 N.C. State Bar v. Merrell
 
 , --- N.C.App. ----, ----,
 
 777 S.E.2d 103
 
 , 114 (2015) (scope of Rule 1.7(a) regarding representation involving conflict of interest);
 
 N.C. State Bar v. Simmons
 
 , --- N.C.App. ----, ----,
 
 757 S.E.2d 357
 
 , 363-64 (meaning of "criminal act" under Rule 8.4(b)),
 
 disc. review denied
 
 ,
 
 367 N.C. 791
 
 ,
 
 766 S.E.2d 848
 
 (2014) ;
 
 N.C. State Bar v. Key
 
 ,
 
 189 N.C.App. 80
 
 , 91-92,
 
 658 S.E.2d 493
 
 , 501 (2008) (scope of "conduct prejudicial to the administration of justice" under Rule 8.4). Therefore, we dismiss Defendant's argument that the DHC erred in treating a deposition as a "tribunal" for purposes of Rule 3.5.
 
 [20]
 

 Defendant also argues that the DHC did not make sufficient findings to support its conclusion that his comments during the Pollard deposition constituted "conduct prejudicial to the administration of justice in violation of Rule 8.4(d)." The Comment to Rule 8.4 states that
 

 [a] showing of actual prejudice to the administration of justice is not required to establish a violation of Paragraph (d). Rather, it must only be shown that the act had a
 
 reasonable likelihood of prejudicing the administration of justice
 
 .... The phrase "conduct prejudicial to the administration of justice" in paragraph (d) should be read broadly to proscribe a wide variety of conduct, including conduct that occurs outside the scope of judicial proceedings.
 

 N.C. Rev. R. Prof. Conduct 8.4, cmt. 4 (emphasis added). We have previously adopted the standard set forth in this Comment in construing Rule 8.4.
 
 See
 

 Key
 
 ,
 
 189 N.C.App. at 91-92
 
 ,
 
 658 S.E.2d at 501
 
 (applying "reasonable likelihood of prejudicing the administration of justice" standard contained in Comment to Rule 8.4 ).
 

 Here, we are satisfied that the DHC's findings-which showed that Defendant repeatedly interjected his own questions and commentary, made sarcastic remarks, coached Pollard on how to respond to particular questions, and answered questions for Pollard-supported its conclusion that Defendant violated Rule 8.4(d) as it was reasonable to conclude that such disruptive and improper tactics "had a reasonable likelihood of prejudicing the administration of justice." N.C. Rev. R. Prof. Conduct 8.4, cmt. 4.
 

 Defendant also contests several of the DHC's findings of fact relating to his statement in an affidavit that he did not sponsor the justice4stacey.com website. Defendant specifically challenges Finding No. 31, which states that "Defendant never specifically billed Barbara Pollard to be reimbursed for the website expenses." He argues that "Barbara Pollard and [Defendant] testified that she reimbursed all website expenses and no one testified otherwise." However, the fact that Pollard may at some point have reimbursed Defendant for the website costs does not undermine Finding No. 31, which simply states that he never specifically billed her for these expenses.
 

 Defendant next challenges Finding No. 32, which states that
 

 [a]lthough Defendant has contended that he was reimbursed by his client for the cost of registering the website, he did not produce any documents in response to a request for production of all documents reflecting payments by him in connection with the justice4stacey website and his efforts to obtain reimbursement from Ms. Pollard. At this hearing, Defendant testified that he did not produce the documents because he did not have them.
 

 Defendant asserts that he attempted to enter such documentation into evidence during the hearing but the DHC denied his
 
 *898
 
 request. Our review of the hearing transcript reveals that based upon the State Bar's objection, the DHC denied Defendant's attempt to enter the receipts into evidence because he had failed to provide them in discovery despite the State Bar's unambiguous request for him to do so. Defendant has not presented any argument that this evidentiary ruling was erroneous. Accordingly, we find no merit to Defendant's challenge to Finding No. 32.
 

 Defendant also challenges Conclusion No. 2(c), which states as follows:
 

 By swearing in an affidavit submitted to the court that he did not sponsor the website and that another person was responsible for the expenses of the website when in fact he was the initial registrant and administrator of the website and paid for the registration, Defendant engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c), and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d) [.]
 

 Defendant contends that "[t]here is no supportive finding that [Defendant] was the 'sponsor' of the website...." However, the DHC made the following findings regarding the website:
 

 24. Defendant was involved in discussions and meetings about setting up the website.
 

 ....
 

 26. Defendant was the initial registrant and administrator of the website which was registered on July 11, 2007.
 

 27. Defendant paid the domain registrar for the website to be registered.
 

 28. Defendant was identified as the contact person on the website and his name, address, telephone number, and email address were listed. As a result, Defendant received numerous phone calls and correspondence from visitors to the website.
 

 29. A passcode was required to post material to the website. Defendant had the passcode and posted some documents on the website.
 

 30. Defendant was involved in the decision to take the website down.
 

 31. Defendant never specifically billed Barbara Pollard to be reimbursed for the website expenses.
 

 These findings describe Defendant's role in planning, registering, paying to set up, controlling access to, and providing content for the website. Therefore, we conclude the DHC's determination that Defendant was the sponsor of the justice4stacey.com website is sufficiently supported by the DHC's findings of fact.
 

 Defendant also argues that the DHC erred in Conclusion No. 2(c) in determining that his misstatement regarding his sponsorship of the website was "conduct prejudicial to the administration of justice[.]" However, we believe that the DHC's findings did, in fact, demonstrate that Defendant's actions "had a reasonable likelihood of prejudicing the administration of justice" as they showed that Defendant made a false representation about a matter material to Fagan's motion to change venue that was pending before the court.
 

 B. The Langston Matter
 

 Defendant challenges the DHC's conclusion that "[b]y abruptly leaving Ms. Langston's deposition with the deponent prior to the completion of opposing counsel's questioning without filing a motion to terminate the deposition, Defendant knowingly disobeyed an obligation under the rules of the tribunal in violation of Rule 3.4(c)[.]" He argues that this conclusion is unsupported because the DHC never specifically named the rule that Defendant disobeyed. However, it is clear that the DHC's conclusion was a reference to Rule 30(d) of the North Carolina Rules of Civil Procedure,
 
 [21]
 
 which is titled
 
 *899
 
 "Motion to terminate or limit examination" and explains that a
 
 judge
 
 -as opposed to counsel for a party-may "cease" or "limit" a deposition "on motion of a party...." The fact that the DHC was referring to Rule 30(d) is apparent because the DHC specifically discussed Defendant ending the deposition without "filing a motion to terminate the deposition [.]" Accordingly, this argument is without merit.
 

 Defendant also challenges the following findings of fact with respect to one of his misstatements during the Langston Matter:
 

 55. On May 2, 2012, in a hearing on the plaintiff's motion to prevent waste of marital and separate property pending equitable distribution, Defendant represented to the presiding judge that R & L Investment Homes, LLC had been dissolved by the North Carolina Secretary of State because Mr. Langston[, the ex-husband of Defendant's client,] had forged documents, stating, "Yes, your Honor, and the Secretary of State just aned the entity because he forged three of 'em that say something different."
 

 56. At the time Defendant made this statement to the court, Defendant knew the North Carolina Secretary of State had issued a Certificate of Administrative Dissolution of R & L Investment Homes, LLC for failure to file an annual report.
 

 Defendant asserts that these findings "do not say that [he] knew the statement at issue was false as required by RPC 8.4 and it [sic] omits undisputed testimony from [him] and Ms. Lee that they both believed the statement to be true." However, the record shows that Defendant himself admitted that he knew the corporation had been administratively dissolved rather than having been dissolved due to fraud. Defendant further acknowledged that at the time he made the statement that the corporation had been "aned" because of fraud, he "knew there was a letter stating that it was administratively dissolved." Accordingly, Findings Nos. 55 and 56 are adequately supported by the evidence.
 

 For similar reasons, we reject Defendant's challenge to Conclusion No. 2(g), which states, in pertinent part, that
 

 [b]y falsely representing to the court that the Secretary of State had dissolved the LLC because of forgery, Defendant engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c), and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d) [.]
 

 Defendant argues that the DHC did not make a specific finding that he
 
 knowingly
 
 made the false statement. However, as explained above, both the DHC's findings and the supporting evidence show that Defendant was indeed aware of the falsity of his statement.
 

 Defendant also contends that the DHC's findings do not support its conclusion that Defendant's misstatement had a prejudicial impact on the administration of justice. This assertion is meritless as the DHC could reasonably have determined that the misrepresentation "had a reasonable likelihood of prejudicing the administration of justice" in that it would have caused the trial court to labor under the false notion that a party in the case had committed forgery.
 

 Defendant next challenges Finding No. 62, which states that
 

 Defendant's statement accusing Mr. Miller[, Defendant's opposing counsel in the Langston Matter,] of slipping the handwritten provision into the mediated settlement agreement after Defendant had signed it and without Defendant's knowledge or approval was false and Defendant knew at the time he made the statement that it was false.
 

 *900
 
 In his brief, Defendant states that "Finding #62 that [Defendant]
 
 knew
 
 ... the statement was false is not supported by the record. [W]here the Bar's own witness contradicted the allegation and 2 witnesses said [Defendant] did not make the statement." (Internal citations omitted.)
 

 We are satisfied that the record contains sufficient evidence from which the DHC could have found that Defendant did, in fact, knowingly make a false statement regarding Miller "slipping" a provision into the settlement agreement without Defendant's knowledge. Miller testified before the DHC that "[Defendant] accused me of slipping [the provision] in before he signed the document and without his knowledge. And that statement was made to Judge Paul."
 

 Judge Paul confirmed in his testimony before the DHC that Defendant made such an accusation in his presence. In addition, the mediator who oversaw the settlement negotiations testified that he had "a specific recollection of pointing out [the added provision] to [Defendant]" and then asking Defendant and his client if "either of you have any problem" with the additional provision at which point the mediator "showed them the provision" and "[t]hey both said they had no problem with it." This testimony is reflected in the DHC's Finding No. 61, which states that "[p]rior to Defendant signing the mediated settlement agreement, the mediator had pointed out the handwritten provision to Defendant and Defendant agreed to the provision."
 

 We note that Defendant correctly points out that Finding No. 62 incorrectly states that Defendant accused Miller of slipping in the provision
 
 after
 
 Defendant signed the settlement agreement rather than
 
 before
 
 he signed it. However, we find this discrepancy immaterial to the overall finding-which, as shown above, is supported by the evidence-that Defendant falsely accused Miller of adding a provision to the settlement agreement without Defendant's knowledge or approval. That finding, in turn, supports the DHC's conclusion of law that Defendant "knowingly made a false statement of material fact to a tribunal in violation of Rule 3.3(a)(1), engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c), and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d)."
 

 Therefore, even though Finding No. 62-as written-is partially unsupported by the evidence of record, the remaining portion of Finding No. 62, in conjunction with Finding No. 61, adequately supports the DHC's legal conclusion.
 
 See, e.g.
 
 ,
 
 Meadows v. Meadows
 
 , --- N.C.App. ----, ----,
 
 782 S.E.2d 561
 
 , 566 (2016) ("[E]ven assuming,
 
 arguendo
 
 , that both findings are not supported by competent evidence, it is of no consequence to the instant case. The remaining binding findings of fact, cited above, are sufficient to support the trial court's judgment....");
 
 Estate
 

 of Gainey v. S. Flooring & Acoustical Co
 
 .,
 
 184 N.C.App. 497
 
 , 503,
 
 646 S.E.2d 604
 
 , 608 (2007) ("[W]here there are sufficient findings of fact based on competent evidence to support the tribunal's conclusions of law, the decision will not be disturbed because of other erroneous findings which do not affect the conclusions." (citation, quotation marks, and brackets omitted)). Accordingly, we find Defendant's argument on this issue to be without merit.
 

 C. The Gorham Matter
 

 Defendant next challenges the following conclusion of law with regard to Defendant's conduct toward Judge Gorham:
 

 By being disrespectful to the judge during a jury trial after having been warned by the Court about his conduct, Defendant knowingly disobeyed an obligation under the rules of the tribunal in violation of Rule 3.4(c), engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d), and engaged in conduct intended to disrupt a tribunal by engaging in undignified or discourteous conduct that is degrading to a tribunal in violation of Rule 3.5(a)(4)(B) [.]
 

 Defendant contends that there is no finding or evidence indicating that he "knowingly disobeyed an obligation under the rules of the tribunal" or engaged in conduct "degrading to a tribunal." Rather, he asserts that the record shows that nothing happened "more than the morning recess in a murder trial."
 

 *901
 
 The DHC made the following findings with regard to this incident:
 

 64. During the course of the trial Defendant spoke disrespectfully to the judge at a bench conference and Judge Gorham admonished Defendant about engaging in disrespectful behavior toward the court.
 

 65. Subsequently, at another bench conference on August 1, 2012, while the jury was present in the courtroom, Defendant grimaced at Judge Gorham and in an angry tone of voice accused Judge Gorham of allowing the prosecutor to get inadmissible evidence to the jury.
 

 66. Defendant's conduct prompted Judge Gorham to declare a recess in the trial and give the jury a break so that she could address Defendant's conduct.
 

 67. During the in-chambers discussion about Defendant's conduct, Defendant stated: a) "And I do think if I was angry, I am sorry that I was angry and I expressed it. I'm not going to deny that I was." and b) "you said that I appeared disrespectful and I had a grimace and I am trying to explain that I was upset and the reasons that have gone into my [being] upset."
 

 68. Rule 12 of the North Carolina General Rules of Practice for the Superior and District Courts provides: "Counsel are at all times to conduct themselves with dignity and propriety ... Counsel should yield gracefully to rulings of the court and avoid detrimental remarks both in court and out. He should at all times promote respect for the court."
 

 These findings-which are supported in the record by the testimony of Assistant District Attorney Mike Muskus, who was the prosecutor present during these events-clearly support the DHC's conclusions. To the extent Defendant argues there is no evidence that he
 
 knew
 
 he was violating a rule or causing a disruption, it is axiomatic that one's state of mind is rarely shown by direct evidence and must often be inferred from the circumstances.
 
 See
 

 Johnson v. Phoenix Mut. Life
 

 Ins
 
 .
 
 Co.
 
 ,
 
 300 N.C. 247
 
 , 260,
 
 266 S.E.2d 610
 
 , 619 (1980) ("A litigant's state of mind is seldom provable by direct evidence but must ordinarily be proven by circumstances from which it may be inferred."). Here, it was eminently reasonable for the DHC to conclude that Defendant understood he was not conducting himself "with dignity and propriety," "yield[ing] gracefully to rulings of the court," "avoid[ing] detrimental remarks both in court and out[,]" and "promot[ing] respect for the court."
 

 D. The Davenport Matter
 

 With respect to his representation of Davenport, Defendant first challenges the DHC's finding that he "sent a demand letter" to Roughton and the Sheriff of Pasquotank County. However, Defendant admitted in his answer filed with the DHC that he sent the demand letter. Accordingly, he may not challenge on appeal the DHC's finding as to that fact.
 
 See
 

 Baker v. Mauldin
 
 ,
 
 82 N.C.App. 404
 
 , 406,
 
 346 S.E.2d 240
 
 , 241 (1986) (holding that a defendant is bound by admissions in his answer).
 

 Defendant also challenges Finding No. 84, which states, in relevant part, that Defendant "was aware that [Norman] Shearin represented Roughton in the dispute with Davenport...." However, among other evidence establishing that Defendant knew Roughton was represented by counsel, the record shows that (1) Roughton's attorney, Shearin, testified that he had conversations with Phillip Hayes, Defendant's co-counsel, regarding the dispute between Roughton and Davenport; and (2) within a month prior to sending the demand letter, Defendant contacted Shearin's office about taking Roughton's deposition. Accordingly, this evidence supports the DHC's finding that Defendant did indeed know Roughton was represented by counsel at the time he sent the demand letter.
 

 Defendant next challenges the DHC's Conclusion No. 2(j), which states that
 

 [b]y impugning the integrity of the investigating officer in Davenport's pending criminal cases and accusing the Sheriff's Department of a criminal act in a video posted online, Defendant used means in representing a client that had no substantial purpose other than to embarrass or burden a third person in violation of Rule 4.4(a)[.]
 

 *902
 
 Specifically, Defendant contends that "[t]here is no finding or fact in the record which shows that [he] accused [Investigator] Keith of being dishonest or lacking in integrity nor even that Keith was 'the investigating officer.' "
 

 However, the Pasquotank County Attorney, Mike Cox, testified that Investigator Keith was indeed the officer investigating Davenport. Moreover, both the DHC's findings of fact and the video evidence of the encounter, which is in the record, establish that when Investigator Keith refused to release certain property to Defendant, Defendant referenced North Carolina's embezzlement statute and stated that it was a "class C felony by the sheriff" for him not to return to the proper owner property obtained under color of law.
 

 Given the contents of the video and Defendant's admission that he put the video on the Internet to be "a smart aleck" rather than to further his representation of Davenport, we are satisfied that there is support in the record for the DHC's conclusion that Defendant "used means in representing a client that had no substantial purpose other than to embarrass or burden a third person in violation of Rule 4.4(a)."
 

 E. The Shackley Matter
 

 Defendant challenges Findings Nos. 95 and 97 in connection with the Shackley Matter, which state as follows:
 

 95. Thereafter during the phone conversation, Defendant made a number of assertions about Hughes, including that Hughes had "hit on" Shackley's wife, who "had big boobs" and ran a prostitution website.
 

 ....
 

 97. Immediately after the phone conversation, Hughes's acquaintance called Hughes and reported-among other things-that Defendant had referenced Hughes' [s] preference for bigbreasted women, and his interest in a "prostitute."
 

 While Defendant contends that these findings are "misleading to a fraudulent degree," he fails to explain how this is so. Moreover, these findings are largely supported both by Sugg's testimony and the handwritten notes she made on the evening of the call.
 

 F. The Dolenti Matter
 

 Defendant argues that the characterization in Finding No. 103 of the tone of the voicemail he left for Dolenti as "threatening, insulting, and intimidating" is unsupported because Detective Dolenti never testified at the disciplinary proceeding. However, based on our consideration of the voicemail-which is contained in the record on appeal as an audio recording-we believe that the evidence fully supported the DHC's finding that Defendant's tone was "threatening, insulting, and intimidating."
 

 G. The Deans Matter
 

 We also find no merit in Defendant's challenge to Finding No. 110, which states that "Defendant's comments to Mrs. Deans about her father and stepmother and the Pitt County District Attorney were malicious and vindictive." Defendant's sole ground for challenging this finding is that neither the complaint nor the Order of Discipline included the actual words used in the voicemail. However, the voicemail was entered into evidence during the proceeding and is part of the record on appeal. The recording supports the DHC's determination that the comments made about Deans' father and stepmother and the district attorney were "malicious and vindictive." Nor are we persuaded by Defendant's argument that the DHC was required to quote verbatim the inappropriate comments he made.
 

 Conclusion
 

 For the reasons stated above, we affirm the DHC's 13 November 2014 Order of Discipline.
 

 AFFIRMED.
 

 Chief Judge McGEE and Judge STEPHENS concur.
 

 [1]
 

 The DHC had issued an initial version of its findings and conclusions regarding the adjudicatory phase on 18 July 2014. The DHC subsequently released a corrected version of these findings and conclusions on 8 August 2014.
 

 [2]
 

 The DHC concluded that these actions violated Rule 3.5(a)(4) (conduct intended to disrupt a tribunal), Rule 8.4(d) (conduct prejudicial to the administration of justice), and Rule 4.4(a) (using means that have no substantial purpose other than to embarrass or burden a third person).
 

 [3]
 

 The DHC concluded that Defendant's misrepresentation regarding his sponsorship of the website violated Rule 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and Rule 8.4(d) (conduct prejudicial to the administration of justice).
 

 [4]
 

 The DHC concluded that Defendant's actions during this deposition violated Rule 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal), Rule 3.5(a)(4) (conduct intended to disrupt a tribunal), and Rule 8.4(d) (conduct prejudicial to the administration of justice).
 

 [5]
 

 The DHC concluded that these misrepresentations violated Rule 8.4(c) (conduct involving dishonesty, deceit or misrepresentation), Rule 8.4(d) (conduct prejudicial to the administration of justice), and Rule 3.3(a)(1) (making a false statement of material fact to a tribunal).
 

 [6]
 

 The DHC concluded that Defendant's behavior before Judge Gorham violated Rule 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal), Rule 8.4(d) (conduct prejudicial to the administration of justice), and Rule 3.5(a)(4)(B) (conduct intended to disrupt a tribunal).
 

 [7]
 

 The DHC concluded that these actions violated Rule 4.4(a) (using means in representing a client that have no substantial purpose other than to embarrass or burden a third person).
 

 [8]
 

 The DHC concluded that Defendant's actions in sending the letter violated Rule 4.2 (communicating with persons known to be represented by counsel).
 

 [9]
 

 The DHC concluded that this conduct violated Rule 4.4(a) (using means in representing a client that have no substantial purpose other than to embarrass or burden a third person).
 

 [10]
 

 The DHC concluded that this conduct violated Rule 4.4(a) (using means in representing a client that have no substantial purpose other than to embarrass or burden a third person) and Rule 8.4(d) (conduct prejudicial to the administration of justice).
 

 [11]
 

 The DHC concluded that Defendant's statements on the voicemail violated Rule 4.4(a) (using means in representing a client that have no substantial purpose other than to embarrass or burden a third person).
 

 [12]
 

 The DHC concluded that by virtue of his actions with regard to Deans' case, Defendant violated Rules 8.4(a) and (g) (attempting to intentionally prejudice a client during the course of the professional relationship), Rule 1.16(d) (failing to take reasonably practicable steps to protect a client's interests upon termination of the representation), Rule 1.4(a) (failing to comply with a reasonable request for information), and Rule 1.4(b) (failing to explain a matter to the extent reasonably necessary to permit a client to make informed decisions about the representation).
 

 [13]
 

 These additional incidents included, without limitation, Defendant referring to the Pasquotank County Attorney as an "idiot" who made "asinine" assertions and "should be ashamed of himself"; accusing attorney Shearin of engaging in "Gestapo tactics"; acting "disruptive and disrespectful" to a Superior Court judge in Hertford County and accusing the district attorney in that case-in front of a jury-of lying; accusing another assistant district attorney of being "mentally ill" and a "f* * * ing Nazi" and stating to him, "I am telling you this son, and I can call you son because that's what you deserve to be called, if I didn't have a bar license, you would be a greasy spot on that table"; referring to the Greensboro Police Chief alternatively as "Mohammed," "Sahheb," and "Ahmed" when his name was actually Hassan Aden; and ordering a Superior Court judge-in open court and in the presence of the public-to "wipe the smirk off [his] face."
 

 [14]
 

 In his brief, Defendant cites to
 
 N.C. State Bd. of Dental Examiners v. F.T.C
 
 ., --- U.S. ----,
 
 135 S.Ct. 1101
 
 ,
 
 191 L.Ed.2d 35
 
 (2015), a case considering whether the North Carolina Board of Dental Examiners was entitled to immunity from suit under federal antitrust law. However, he fails to demonstrate how that case is relevant to the present action.
 

 [15]
 

 We note that while this case was pending before the DHC, Defendant asserted several First Amendment claims arising from this disciplinary proceeding in a lawsuit against the State Bar filed in Wake County Superior Court. That complaint was dismissed, and Defendant did not appeal the decision.
 

 [16]
 

 After Defendant challenged the lack of an original signature on the initial complaint, the DHC allowed the State Bar to retroactively file versions of the complaints containing Hunt's original ink signature.
 

 [17]
 

 We note that pursuant to 27 N.C. Admin. Code 1B.0113(n), the Grievance Committee chairperson was only required to approve, rather than sign, the amended complaints.
 

 [18]
 

 The DHC dedicated 13 single-spaced pages of the dispositional portion of its Order of Discipline to describe numerous incidents involving actual or potential harm caused by Defendant's actions. Defendant does not make any specific challenges to these findings. Rather, he asserts that (1) the DHC did not tie the incidents described in those findings to specific violations of the Rules of Professional Conduct; and (2) some of those incidents occurred outside of the six-year statute of limitations that generally applies to the filing of attorney misconduct grievances,
 
 see
 
 27 N.C. Admin. Code 1B.0111(f)(4). However, Defendant fails to point to any authority mandating that facts relevant at the
 
 dispositional
 
 phase-as opposed to facts underlying a particular
 
 adjudication
 
 of misconduct-must be specifically tied to a particular disciplinary rule or have occurred within six years of the filing of a grievance. In fact, "[i]f the charges of misconduct are established, the hearing panel will then consider
 
 any
 
 evidence relevant to the discipline to be imposed." 27 N.C. Admin. Code 1B.0114(w) (emphasis added).
 

 [19]
 

 Moreover, we note that
 
 N.C. Gen. Stat. § 84-34.2
 
 expressly permits the State Bar to impose certain types of fees, including an "administrative fee for any attorney against whom discipline has been imposed."
 
 N.C. Gen. Stat. § 84-34.2
 
 (2015). In its brief, the State Bar has represented to this Court that "[i]n April 2010, the [State Bar] Council adopted a schedule of administrative fees for the disciplinary program that included a fee of $1,500.00 per day for each day spent in a contested DHC hearing that resulted in the imposition of discipline."
 

 [20]
 

 Our holding on this issue applies equally to Defendant's challenges to Conclusions Nos. 2(d)-(e) of the DHC's conclusions of law from the adjudicatory phase in which he makes the same argument with respect to his conduct during the Langston deposition.
 

 [21]
 

 N.C. R. Civ. P. 30(d) provides as follows:
 

 (d) Motion to terminate or limit examination.-At any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, a judge of the court in which the action is pending or any judge in the county where the deposition is being taken may order before whom the examination is being taken to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c). If the order made terminates the examination, it shall be resumed thereafter only upon the order of a judge of the court in which the action is pending. Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.