DAVIS, Judge.
 

 *652
 
 Dawn E. Ely appeals from an order of discipline entered by the Disciplinary Hearing Commission (the "DHC") of the North Carolina State Bar suspending her law license for a period of five years after determining that she had committed a number of violations of the North Carolina Rules of Professional Conduct. After a thorough review of the record and applicable law, we affirm.
 

 Factual and Procedural Background
 

 On 10 September 1993, Ely was admitted to the State Bar as an attorney licensed to practice law in North Carolina. In October 2006, she also became a licensed attorney in Georgia.
 

 In 2005, Ely formed a business called Palladium Legal Services, LLC ("Palladium"), a limited liability company registered in Georgia. Palladium offers temporary or full-time in-house legal counsel for small to mid-sized businesses. In order to obtain its services, clients must first pay a fee to Palladium and are then matched with one of the company's attorneys, who are called "Chief Legal Officers" ("CLOs"). These CLOs receive from Palladium a portion of the fee paid to the company by the client. The CLOs do not receive any compensation directly from the client.
 

 *653
 
 For several years, Ely served as the president of Palladium and as one of its CLOs. She is also the sole member of the limited liability company.
 

 On 10 June 2011, Ely was administratively suspended by the State Bar from the practice of law in North Carolina for noncompliance with continuing legal education and dues requirements. On 1 July 2011, she was also suspended from practicing law in Georgia due to her failure to pay mandatory membership dues.
 

 Despite these administrative suspensions, Palladium continued to operate, and Ely remained in her position as president. Her biographical information-including her previous legal experience-remained on Palladium's website on a webpage titled "Meet our CLOs."
 

 In January 2008, Ely sent on behalf of Palladium a proposed employment contract to Henry Abelman, a North Carolina attorney whose license was inactive. Abelman did not sign the contract and never formally agreed to become a CLO. Ely nevertheless updated Palladium's website to list Abelman's biographical information and display his picture on the "Meet our CLOs" webpage.
 

 In August and September 2012, mass-marketing emails were sent at Ely's direction targeting small business owners in North Carolina and informing them of the legal services offered by Palladium. One of the recipients of these emails was Tony Maupin, a North Carolina business owner, who received both an initial email and a follow-up email. At the bottom of the emails to Maupin, Ely signed her name as "Dawn Ely, Esq." Maupin subsequently filed a grievance against Ely with the State Bar regarding the emails.
 

 On 6 September 2012, the Authorized Practice Committee of the State Bar sent
 
 *349
 
 Ely a letter informing her that she was "engaged in activities that may constitute the unauthorized practice of law in North Carolina." The record does not indicate that Ely ever responded to the letter. On 2 February 2015, the committee followed up on its 6 September 2012 letter with a Letter of Caution, informing her that the committee had "probable cause to believe that ... [her] activities ... violate[d] the unauthorized practice of law statutes." Once again, the record is devoid of any response from Ely.
 

 On 30 July 2015, the Grievance Committee of the North Carolina State Bar issued a Notice of Admonition to Ely. Ely informed the State Bar on 9 September 2015 that she was "reject[ing] the allegations contained in th[e] Admonition."
 

 *654
 
 On 4 January 2016, the State Bar filed a complaint with the DHC alleging violations of Rules 5.5(b)(2), 7.1(a), 7.3(a), and 8.4(c) of the North Carolina Rules of Professional Conduct based on Ely's (1) actions in holding herself out as a licensed attorney despite her administrative suspension; (2) continued operation of Palladium despite her administrative suspension; (3) solicitation of professional employment for pecuniary gain via electronic communications; and (4) actions in holding Abelman out as an attorney offering legal services on behalf of Palladium.
 

 A hearing on the State Bar's complaint was held on 15 July 2016 before a panel of the DHC. On 24 August 2016, the DHC issued an Order of Discipline suspending Ely's license to practice law in North Carolina for five years. Ely filed a timely notice of appeal.
 

 Analysis
 

 On appeal, Ely challenges several of the DHC's findings of fact and conclusions of law made in connection with both the adjudicatory and dispositional phases of the hearing as well as the DHC's ultimate decision to suspend her law license. We first set out the standard of review applicable to orders of discipline from the DHC. Second, we address Ely's arguments as to the sufficiency of the DHC's findings of fact and conclusions of law in the adjudicatory phase. Third, we assess her contentions as to the findings and conclusions with regard to the dispositional phase. Finally, we consider Ely's challenge to the severity of her ultimate punishment.
 

 I. Standard of Review
 

 Pursuant to
 
 N.C. Gen. Stat. § 84-28
 
 , the DHC has the power to discipline any attorney admitted to practice law in the State of North Carolina upon determining that she has violated the North Carolina Rules of Professional Conduct.
 
 N.C. Gen. Stat. § 84-28
 
 (b)(2) (2017). A party may appeal to this Court from a final order of the DHC.
 
 N.C. Gen. Stat. § 84-28
 
 (h).
 

 Disciplinary proceedings of the DHC are divided into two phases: At the "adjudicatory phase," the question is whether "the defendant commit[ed] the offense or misconduct[.]"
 
 N.C. State Bar v. Talford
 
 ,
 
 356 N.C. 626
 
 , 634,
 
 576 S.E.2d 305
 
 , 311 (2003). At the "dispositional phase," the issue concerns "[w]hat is the appropriate sanction for committing the offense or misconduct?"
 

 Id.
 

 In reviewing an order of discipline by the DHC, we apply the whole record test. This test
 

 *655
 
 requires the reviewing court to determine if the DHC's findings of fact are supported by substantial evidence in view of the whole record, and whether such findings of fact support its conclusions of law[.] Such supporting evidence is substantial if a reasonable person might accept it as adequate backing for a conclusion. The whole-record test also mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn. Moreover, in order to satisfy the evidentiary requirements of the whole-record test in an attorney disciplinary action, the evidence used by the DHC to support its findings and conclusions must rise to the standard of clear, cogent, and convincing. Ultimately, the reviewing court must apply all the aforementioned factors in order to determine whether the decision of the lower body, e.g., the DHC, has a rational basis in the evidence.
 

 *350
 

 Id.
 
 at 632,
 
 576 S.E.2d at 309-10
 
 (internal citations, quotation marks, and brackets omitted).
 

 In applying this test, we employ a three-pronged inquiry: "(1) Is there adequate evidence to support the order's expressed finding(s) of fact? (2) Do the order's expressed finding(s) of fact adequately support the order's subsequent conclusion(s) of law? and (3) Do the expressed findings and/or conclusions adequately support the lower body's ultimate decision?"
 
 N.C. State Bar v. Sossomon
 
 ,
 
 197 N.C. App. 261
 
 , 275,
 
 676 S.E.2d 910
 
 , 920 (2009) (citation omitted). "This three-step process must be applied separately to each disciplinary phase[.]"
 

 Id.
 

 (citation omitted).
 

 II. Adjudicatory Phase
 

 A. Challenged Findings of Fact
 

 Ely first argues that the evidence at the hearing was inadequate to support several findings of fact made by the DHC in the adjudicatory phase. The DHC's findings of fact stated as follows:
 

 1. Defendant, Dawn E. Ely ("Defendant"), was admitted to the North Carolina State Bar on September 10, 1993; and is, and was at all times referred to herein, an attorney at law licensed to practice in North Carolina, subject to the laws of the State of North Carolina, the
 
 *656
 
 Rules and Regulations of the State Bar, and the Rules of Professional Conduct.
 

 2. Defendant was administratively suspended by the North Carolina State Bar on June 10, 2011 for failure to comply with Continuing Legal Education requirements.
 

 3. As of July 15, 2016, Defendant was still administratively suspended in North Carolina.
 

 4. Defendant is also a licensed attorney in Georgia but has been administratively suspended since July 1, 2011 due to her failure to pay mandatory bar dues.
 

 5. As of July 15, 2016, Defendant was still administratively suspended in Georgia.
 

 6. Defendant operates a business registered in Georgia called Palladium Legal Services, LLC ("PLS") that functions under the trade name Palladium Chief Legal Officers ("PCLO").
 

 7. Neither PLS nor PCLO is authorized to provide legal services in North Carolina.
 

 8. Defendant describes herself as the "President and Founder" of PCLO.
 

 9. Defendant advertises the services of PCLO via email solicitations and a website, www.palladiumclos.com.
 

 10. According to the PCLO website and Defendant's email solicitations, PCLO offers to provide various businesses with legal services through a number of lawyers on the PCLO staff, including Defendant.
 

 11. According to the PCLO website and Defendant's email solicitations, Defendant holds herself out to residents of North Carolina and Georgia as able to provide them with legal services through PCLO despite not being actively licensed in either state.
 

 12. Defendant offers the services of PCLO to businesses and individuals in various states, including those in North Carolina and Georgia.
 

 13. Defendant describes the legal services PCLO offers as "in-house" legal counsel services provided by "Chief Legal Officers."
 

 *657
 
 14. Defendant offers to provide the legal services of attorneys under contract with PCLO to other businesses on a temporary or as needed basis.
 

 15. To obtain the services of these attorneys, clients must retain and pay PCLO which will then instruct one of its attorneys to provide legal services to the client upon payment from PCLO.
 

 16. PCLO attorneys are employees of PCLO and not the companies they serve.
 

 17. Defendant makes all hiring and firing decisions regarding the attorneys who work for PCLO.
 

 18. PCLO attorneys are not paid directly by the businesses they serve, but rather are paid by PCLO.
 

 19. Defendant has sent solicitation emails to potential clients in North Carolina and other states representing that
 
 *351
 
 PCLO could provide them with legal services and advice.
 

 20. In August and September of 2012, Defendant sent emails to Tony Maupin, a North Carolina resident and the owner of a North Carolina company, soliciting his business by offering to provide him with legal services through PCLO attorneys, including Defendant.
 

 21. In Defendant's emails to Tony Maupin, she used the designation "Esq." after her name despite not being actively licensed to practice law in any state at the time.
 

 22. The designation "Esq.," an abbreviation for "Esquire," has historically been used in the United States to indicate to others that someone is an attorney licensed to practice law. Defendant was using the designation "Esq." for this purpose.
 

 23. In or around January 2008, Defendant sent a proposed employment contract to Henry Abelman ("Abelman"), a North Carolina licensed attorney who moved to inactive status in 1998, in an effort to hire him as an attorney employee of PCLO.
 

 24. The contract Defendant sent to Abelman notes in one provision that Abelman "agrees to perform legal
 
 *658
 
 counsel services on behalf of Company [PCLO] to third party companies retaining Company[.]"
 

 25. Abelman did not agree to the provisions in the contract and did not agree to become an employee of Defendant's company.
 

 26. Defendant nonetheless held out on her website that Abelman was an employee of PCLO and was able to provide legal services to North Carolina residents on behalf of the company.
 

 27. The contract Defendant had clients of Palladium sign indicated in numerous places that Palladium was providing legal services to the clients:
 

 a. "This Attorney Engagement & Consulting Agreement for Services ("Agreement") is made and entered into effective as of the ___ day of ___, 2015, by and between Palladium Legal Services, a Georgia LLC d/b/a Palladium Chief Legal Officers ("Palladium" or "Company") with offices at 2625 Piedmont Rd., NE, Suite 56-117, Atlanta GA 30324 and _______________, a ________________ company with its principal offices located at _______________ ("Client")."
 

 b. "Client hereby engages Company [Palladium], to provide in-house legal services for the term and compensation described herein. Company agrees to assign an appropriate Paladium [sic] Attorney, who at the time of execution of this Agreement shall be ______________ ("Attorney") to perform the services specified in the "Description of Services" (the "Services'') attached to this Agreement as Exhibit A and incorporated herein by reference."
 

 c. "Company [Palladium] warrants that it shall perform the Services utilizing at least the degree of skill and care exercised by diligent and prudent professionals performing similar services in accordance with best industry practices."
 

 Although Ely challenges Finding Nos. 11, 22, and 26, the remainder of the above-quoted findings are unchallenged. Thus, these unchallenged findings are binding on appeal.
 
 Koufman v. Koufman
 
 ,
 
 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991) ("Where no exception is taken to a
 
 *659
 
 finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal."). We address each challenged finding of fact below.
 

 1. Finding of Fact No. 11
 

 Finding No. 11 states as follows:
 

 11. According to the PCLO website and Defendant's email solicitations, Defendant holds herself out to residents of North Carolina and Georgia as able to provide them with legal services through PCLO despite not being actively licensed in either state.
 

 Ely argues that she "did not provide legal services to anyone after being administratively suspended in North Carolina and Georgia and had not practiced law for several years before the suspensions." Moreover, she asserts that "[n]owhere on the website did
 
 *352
 
 she affirmatively state that she was actively licensed to practice law in North Carolina or that she was available to be a chief legal officer for any company."
 

 During the adjudicatory phase of the 15 July 2016 hearing, the State Bar offered as evidence excerpts from Palladium's website. On the website's "Meet our CLOs" webpage, Ely was prominently listed as a CLO who could serve a client's legal needs. The webpage referenced Ely's previous legal experience (including her background serving as in-house counsel) and did not contain any statement or suggestion that she was not currently licensed to practice law in North Carolina.
 

 The State Bar also provided evidence of the email correspondence between Ely and Maupin. In her email to Maupin, Ely stated that she wanted to discuss legal matters with him if he had time to speak to her. In this email, she made direct reference to Palladium's website by including a hyperlink to the "Meet our CLOs" webpage. Thus, had Maupin-or any other potential North Carolina client receiving this email-clicked onto this webpage link, he would have been under the false impression that Ely was licensed to provide legal services to clients in North Carolina. Thus, the DHC's finding that Ely falsely held herself out as being able to provide legal services was supported by clear, cogent, and convincing evidence.
 

 2. Finding of Fact No. 22
 

 Finding No. 22 states as follows:
 

 22. The designation "Esq.," an abbreviation for "Esquire," has historically been used in the United States to indicate
 
 *660
 
 to others that someone is an attorney licensed to practice law. Defendant was using the designation "Esq." for this purpose.
 

 Ely argues that Finding No. 22 was unsupported by evidence regarding her purpose in using the abbreviation "Esq." and the historical meaning of that term. The State Bar introduced evidence of Ely's first email to Maupin, which stated as follows:
 

 Hi Tony,
 

 Business executives complain about the high cost of legal services and the frustrating inaccessibility to legal expertise that can often compromise their business goals. In a quick 10 minute call I'd like to learn your areas of concern and explain how
 
 Palladium CLOs
 
 can provide you with answers and solutions-we are willing to provide you with information and see where we can help.
 

 Palladium Chief Legal Officers solve these problems by providing access to a cost-effective, part-time, in-house legal counsel who delivers extraordinary value to your company: Highly-experienced CLOs who understand business needs and have worked in your industry. Our fees are cost-effective with flat rates with zero infrastructure costs (vs. employee or hourly consultant model). Our service options are based on your legal needs and for less than your current legal fees, more work will get done, with the same level of expertise.
 

 Tony, are there 10 minutes in the upcoming weeks that I can call you to discuss these matters?
 

 Regards,
 

 Dawn Ely, Esq.
 

 President & Founder
 
 [1]
 

 During Ely's cross-examination at the adjudicatory phase of the hearing, the following exchange occurred:
 

 [COUNSEL FOR STATE BAR:] And you indicate here at the bottom of both emails, you have your name and then you have "Esquire."
 

 [ELY:] Uh-huh (yes).
 

 *661
 
 [COUNSEL FOR STATE BAR:] Why is that?
 

 [ELY:] Well, because I have always, since I passed the bar, used that E-s-q as an identifier that I am a lawyer.
 

 [COUNSEL FOR STATE BAR:] So it identifies that you are an attorney.
 

 [ELY:] It identifies that I'm an attorney, but my role with the company is not as a chief legal officer, it is identified there in
 
 *353
 
 my signature block as president and founder.
 

 [COUNSEL FOR STATE BAR:] But you included the esquire to identify to Mr. Maupin that you are an attorney.
 

 [ELY:] An attorney that, frankly, because I am an attorney, I do understand all of these issues, I understand the needs, I understand the type of person that would be the right person for a particular role.
 

 [COUNSEL FOR STATE BAR:] So you're indicating to him that your experience, which is also he [sic] could find on your website, and the legal services that you have provided to others in the past, which he could also find on your website, really adds some validity to Palladium.
 

 [ELY:] I think it clarifies what my background and knowledge base is.
 

 [COUNSEL FOR STATE BAR:] To what end?
 

 [ELY:] To the fact that I have been there, I know what some of these issues are in terms of what a business needs, where a business can sometimes falter. I've had people, when they have a call with me, ask me, "Are you an attorney yourself?" and I say yes.
 

 I've also have [sic] companies ask me if I can be their chief legal officer, and I say no.
 

 [COUNSEL FOR STATE BAR:]
 
 But you do say that you are an attorney.
 

 [ELY:]
 
 Well, yes.
 

 (Emphasis added.)
 

 *662
 
 She also stated the following in her testimony:
 

 [ELY:] Yeah. I want to make sure you understand the process. I, along with my business development drafter, drafted these emails. My business development director actually identified potential companies that fit the profile of company and executive that we have found typically is in the market for needing some part-time chief legal officer services. So I did not personally identify Tony Maupin, and the email was sent from my business development director, but the content of the email I approved.
 

 ....
 

 ... I was wanting to clarify because it is being shown as being sent from me, but I do not hit the "Send" button, but I approved of the process for identifying target companies and executives that fit the profile of small/mid-size business that is large enough to potentially need somebody on an in-house basis, and so these emails go out to people from my business development director.
 

 ... I take responsibility for them, but if your question is did I identify Tony Maupin, no, I didn't, but I identified the profile that he fits of the small/mid-size business size and senior executive that may have an interest in a part-time general counsel.
 

 The DHC concluded-and we agree-that the clear implication from Ely's inclusion of the abbreviation "Esq." following her signature in the emails to Maupin, the hyperlink to Palladium's website, and her testimony on this subject at the hearing is that she intended to convey to recipients of the email that she was able to provide legal services as an attorney.
 
 [2]
 
 Moreover, while our courts have not previously had occasion to address this issue, courts in a number of other jurisdictions have determined that the use of the title "Esquire" by one not licensed to practice law constitutes the unauthorized practice of law.
 
 See, e.g.
 
 ,
 
 Fla. Bar v. Lister
 
 ,
 
 662 So.2d 1241
 
 , 1241-42 (Fla. 1995) (respondent engaged in unlicensed practice of law where he described himself as "Esquire" on correspondence and identified himself as an attorney in
 
 *663
 
 a phone conversation);
 
 In re Contempt of Mittower
 
 ,
 
 693 N.E.2d 555
 
 , 558 (Ind. 1998) (respondent engaged in unauthorized practice of law where he labeled himself "esquire," "general counsel," or "attorney-in-fact" on business cards, letterhead, and other documents available to general public);
 
 Disciplinary Counsel v. Brown
 
 ,
 
 121 Ohio St. 3d 423
 
 , 431,
 
 905 N.E.2d 163
 
 , 171 (2009) ("... [R]espondent's use of the term 'Esq.' induced clients to believe that he was a lawyer, a misunderstanding that he was aware of and
 
 *354
 
 failed to correct.");
 
 In re V.I. Bar Ass'n Comm. on the Unauthorized Practice of Law
 
 ,
 
 59 V.I. 701
 
 , 733 (2013) ("We hold that Campbell's general use of 'Esquire,' 'Esq.,' and 'Attorney' in emails and other correspondence, even when not issued in conjunction with a specific legal matter, constitutes hold[ing] oneself out as rendering any service which constitutes the unauthorized practice of law." (citations, quotation marks, and brackets omitted) ).
 

 3. Finding of Fact No. 26
 

 Finding No. 26 states as follows:
 

 26. Defendant nonetheless held out on her website that Abelman was an employee of PCLO and was able to provide legal services to North Carolina residents on behalf of the company.
 

 Ely challenges the evidentiary support for Finding No. 26, contending that "[n]o representation was made on the website as to [Abelman's] licensure status in North Carolina or any other state." She also asserts that the mere presence of Abelman's name and biographical information on Palladium's website did not amount to holding him out as an attorney who was able to provide legal services on behalf of the company.
 

 During the DHC hearing, the State Bar introduced evidence that (1) Abelman never signed an employment contract with Palladium; and (2) Abelman's license to practice law in North Carolina was inactive. Ely nevertheless listed him as a CLO whose credentials could be viewed on Palladium's website.
 

 Furthermore, the email Ely sent Maupin-a North Carolina business owner-included a hyperlink to Palladium's website where Abelman's information was displayed. Thus, any visitor to the website would rationally conclude that Abelman was, in fact, a CLO of Palladium and thus capable of providing legal services to Palladium's clients. Moreover, a potential North Carolina client viewing the website would likewise assume that Abelman was authorized to provide legal services in North Carolina.
 

 *664
 

 B. Challenged Conclusions of Law
 

 We turn next to Ely's argument that the DHC improperly concluded that she violated Rules 5.5(b)(2), 7.1(a), 7.3(a), and 8.4(c) of the North Carolina Rules of Professional Conduct. We address in turn her arguments as to each of these rules.
 

 1. Rule 5.5(b)(2)
 

 Rule 5.5(b)(2) states as follows:
 

 (b) A lawyer who is not admitted to practice in this jurisdiction shall not:
 

 ....
 

 (2) hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.
 

 N.C. R. Prof. Cond. 5.5(b)(2).
 

 The DHC's findings demonstrate that Ely violated Rule 5.5(b)(2) by (1) identifying herself as a CLO on Palladium's website; (2) providing her background as an attorney on the website with no indication of the current status of her license; and (3) emailing Maupin a link to the website and using the title "Esq." in the signature line of her email to him. By committing these acts, Ely held herself out as a lawyer who was admitted to practice law in North Carolina in violation of Rule 5.5(b)(2).
 

 2. Rule 7.1(a)
 

 Rule 7.1(a) states, in pertinent part, as follows:
 

 (a) A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:
 

 (1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;
 

 N.C. R. Prof. Cond. 7.1(a).
 

 As previously stated, the DHC found that Ely (1) falsely implied she could serve as an attorney on behalf of Palladium; (2) listed herself as a CLO on Palladium's website; and (3) held herself out as an attorney to Maupin by emailing him a link to the website and using the title "Esq." in the signature line of her email. By taking these actions, Ely violated Rule 7.1(a).
 

 *665
 
 Moreover, Ely violated Rule 7.1(a) by holding Palladium out as a company that could
 
 *355
 
 provide legal services and advice to Maupin when, in fact, at least two of the sixteen attorneys advertised on the website as CLOs (Ely and Abelman) were not licensed to practice law in North Carolina. Because the website's reference to both Ely and Abelman was misleading, she violated Rule 7.1(a) in this respect as well.
 

 3. Rule 7.3(a)
 

 Rule 7.3(a) states as follows:
 

 (a) A lawyer shall not by in-person, live telephone, or real-time electronic contact solicit professional employment from a potential client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted:
 

 (1) is a lawyer; or
 

 (2) has a family, close personal, or prior professional relationship with the lawyer.
 

 N.C. R. Prof. Cond. 7.3(a).
 

 The DHC's findings demonstrate that Ely violated the prohibition against soliciting professional employment via electronic contact as contained in Rule 7.3(a). She emailed Maupin for the express purpose of promoting Palladium's legal services, and therefore, increasing her opportunity to obtain pecuniary gain.
 

 4. Rule 8.4(c)
 

 Rule 8.4(c) states as follows:
 

 It is professional misconduct for a lawyer to:
 

 ....
 

 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness as a lawyer[.]
 

 N.C. R. Prof. Cond. 8.4(c).
 

 The DHC's findings likewise support the conclusion that Ely violated Rule 8.4(c). She falsely represented on Palladium's website that Abelman could serve as an attorney on behalf of Palladium despite his status with the State Bar being "inactive" as well as the fact that he had never actually signed a contract with Palladium. She further included the hyperlink to the website in her emails to Maupin and the other recipients.
 

 *666
 
 * * *
 

 Thus, we are satisfied that the findings of fact contained in the DHC's order of discipline support its conclusions that Ely violated Rules 5.5(b)(2), 7.1(a), 7.3(a), and 8.4(c) and that those findings were supported by clear, cogent, and convincing evidence. Accordingly, we overrule Ely's arguments as to the adjudicatory phase of the DHC's order.
 
 See
 

 N.C. State Bar v. Sutton
 
 , --- N.C. App. ----, ----,
 
 791 S.E.2d 881
 
 , 900 (2016) (upholding DHC's findings of fact and conclusions of law in adjudicatory portion of disciplinary order),
 
 appeal dismissed
 
 ,
 
 369 N.C. 534
 
 ,
 
 797 S.E.2d 296
 
 (2017).
 

 III. Dispositional Phase
 

 We next consider Ely's challenges to the DHC's findings and conclusions concerning the dispositional phase. The DHC may consider several factors in determining the appropriateness of a disciplinary measure.
 
 See
 
 27 N.C. Admin. Code 1B.0114(w) (2016) (listing factors that DHC may find as meriting suspension, disbarment, or other disciplinary measures).
 
 [3]
 

 However, it is well settled that
 

 [t]he DHC must support its punishment choice with written findings that are consistent with the statutory scheme of
 
 N.C. Gen. Stat. § 84-28
 
 (c). The order must also include adequate and specific findings that address how the punishment choice (1) is supported by the particular set of factual circumstances and (2) effectively provides protection for the public.
 

 N.C. State Bar v. Adams
 
 ,
 
 239 N.C. App. 489
 
 , 495-96,
 
 769 S.E.2d 406
 
 , 411 (2015) (internal citations omitted). Here, Ely challenges Conclusion No. 1 of the DHC's order, which states as follows:
 

 1. The Hearing Panel considered all of the factors enumerated in 27 N.C.A.C. 1B § .0114(w)(1), (2) and (3) of the Rules and Regulations of the State Bar, and concludes
 
 *356
 
 that the following factors are applicable:
 

 27 N.C.A.C. 1B § .0114(w)(l)
 

 a. Factor (B), Intent of the defendant to commit acts where the harm or potential harm is foreseeable; and
 
 *667
 
 b. Factor (I), Acts of dishonesty, misrepresentation, deceit, or fabrication.
 

 27 N.C.A.C. 1B § .0114(w)(2)
 

 a. Factor (A), Acts of dishonesty, misrepresentation, deceit, or fabrication.
 

 27 N.C.A.C. 1B § .0114(w)(3)
 

 a. Factor (G), Multiple offenses; and
 

 b. Factor (O), Refusal to acknowledge wrongful nature of conduct.
 

 We address Ely's arguments as to each challenged factor in turn.
 

 A. Intent to Commit Acts Causing Potential Harm
 

 Ely contends that the DHC erred by concluding that she intended to commit any act with the potential to cause harm. However, the DHC found that Ely (1) falsely held herself out as a CLO who was able to provide legal services despite her administrative suspension; (2) contacted a North Carolina business owner on behalf of her company seeking to provide legal services for her own pecuniary gain; and (3) advertised the services of Abelman despite his inactive status and lack of any employment contract with Palladium.
 

 The DHC's findings support the notion that Ely's wrongful acts were not by mistake or accident but were instead intentionally committed.
 
 See
 

 Sutton
 
 , --- N.C. App. at ----,
 
 791 S.E.2d at 901
 
 ("To the extent Defendant argues there is no evidence that he knew he was violating a rule or causing a disruption, it is axiomatic that one's state of mind is rarely shown by direct evidence and must often be inferred from the circumstances." (citation omitted) ). Indeed, as previously discussed, Ely's own testimony reveals that she approved of her business development director sending emails on her behalf with the intent of targeting small businesses in need of legal services and that she intended to communicate to Maupin that she was an attorney. Thus, we cannot say that the DHC erred in concluding that she intended to commit acts creating the potential for foreseeable harm.
 

 B. Acts of Dishonesty, Misrepresentation, Deceit or Fabrication
 

 Ely also argues that the DHC erroneously concluded that she committed acts of dishonesty, misrepresentation, deceit, or fabrication. However, her argument on this issue is largely derivative of her previous arguments as to the DHC's findings in the adjudicatory phase. The DHC
 

 *668
 
 concluded that Ely "made false or misleading statements" in violation of Rule 7.1(a) about both her and her company's ability to provide legal services and that she engaged in the unauthorized practice of law in violation of Rule 5.5(b)(2). As discussed above, these conclusions were supported by the DHC's findings of fact.
 

 C. Multiple Offenses
 

 Ely next asserts that the DHC's conclusion that she committed multiple offenses constituted error. Once again, Ely's arguments on this issue simply restate her previous challenges to the findings made in connection with the adjudicatory phase of the proceedings. The DHC properly concluded that Ely violated the North Carolina Rules of Professional Conduct by (1) holding herself out as legally able to provide legal services; (2) holding her company out on its website as authorized to provide legal services; (3) contacting Maupin via email; and (4) listing Abelman as an attorney employed by her company on its website. Thus, we reject Ely's contention that the DHC improperly found that she had committed multiple offenses.
 

 D. Refusal to Acknowledge Wrongful Conduct
 

 Finally, Ely argues that the DHC improperly concluded that she refused to recognize the wrongful nature of her conduct. The DHC found during the dispositional phase as follows:
 

 2. Defendant has not acknowledged the wrongful nature of her conduct or indicated remorse.
 

 *357
 
 During the 15 July 2016 hearing, Ely continually refused to accept the fact that her conduct was in violation of North Carolina's Rules of Professional Conduct. The DHC chairman repeatedly gave Ely opportunities to acknowledge her violations, but she was unwilling to do so. Accordingly, Finding of Fact No. 2 and the DHC's subsequent conclusion of law that Ely had "[r]efus[ed] to acknowledge the wrongful nature of [her] conduct" was supported by clear, cogent, and convincing evidence.
 

 IV. Five-Year Suspension
 

 The only remaining question before us is whether the findings and conclusions of the DHC adequately support its ultimate disciplinary decision.
 
 See
 

 Talford
 
 ,
 
 356 N.C. at 639
 
 ,
 
 576 S.E.2d at 314
 
 . Ely contends that her five-year suspension constituted an excessive punishment because the DHC order fails to demonstrate that (1) there was a significant potential harm resulting from her actions; and (2) a lesser sanction would be inadequate to protect the public. In support of this argument,
 
 *669
 
 Ely asserts that the DHC did not properly apply the test required by our Supreme Court in
 
 Talford
 
 .
 

 In
 
 Talford
 
 , the DHC entered an order disbarring an attorney for mismanagement of a trust account. On appeal, the attorney argued that the DHC's findings of fact and conclusions of law from the dispositional phase of the hearing did not adequately explain the conclusion that his misconduct had resulted in a significant potential harm to clients or support the determination that a lesser sanction was inadequate to protect the public.
 
 Id.
 
 at 639,
 
 576 S.E.2d at 314
 
 . Our Supreme Court agreed, stating as follows:
 

 .... None of [the DHC's] discipline-related findings of fact even address, much less explain, why disbarment is an appropriate sanction under the circumstances. ... Certainly, none of the DHC's discipline-related findings and conclusions expressly identify a particular harm, resulting from [the attorney's] actions, that either impeded the administration of justice or was suffered by a client, the public, or the legal profession. The order also does not expressly address how [the attorney's] failure to maintain accurate financial records might result in potentially significant harm to any of the four entities. ... [I]n order to justify the imposition of a more severe sanction, such as censure, suspension, or disbarment, the attorney's misconduct must show either significant harm or the
 
 potential
 
 for
 
 significant
 
 harm. The portion of the DHC order pertaining to discipline assuredly does not expressly link defendant's conduct with such potential, and our review of both the underlying evidence and the DHC's findings and conclusions fails to find support for an inference of such potential. For while we may recognize that an attorney's pattern of commingling account funds necessarily creates the potential for harm to his clients, our review of a specific transgression must also encompass its context, duration, and result.
 

 ....
 

 ... [I]n order to impose a more severe sanction under the statute-censure, suspension, or disbarment-an attorney's misconduct must include attending circumstances that demonstrate: (1) a risk of
 
 significant
 
 potential harm, and (2) that the chosen sanction is necessary in order to
 
 *670
 
 protect the public. This Court has already determined that the attending circumstances of defendant's misconduct fail to evidence a risk of significant potential harm to clients. Thus, in our view, the expressed parameters of the statute preclude the DHC on the facts of this case from imposing on defendant any sanction that requires such a showing. ...
 

 Id.
 
 at 639-41,
 
 576 S.E.2d at 314-15
 
 (internal citations omitted).
 

 In its analysis in
 
 Talford
 
 , the Supreme Court "undertook an exhaustive review of the various sanctions imposed on offending attorneys in the past" and determined that "the disbarment judgment imposed on defendant stands as an aberration ...."
 
 Id.
 
 at 641-42,
 
 576 S.E.2d at 315
 
 (citation and quotation marks omitted). Based on this determination, the Court concluded that there was no rational basis to support disbarment as an appropriate sanction.
 
 Id.
 
 at 642,
 
 576 S.E.2d at 315
 
 .
 

 *358
 
 This Court, however, has distinguished
 
 Talford
 
 in a number of disbarment and suspension cases in which the order of discipline at issue sufficiently demonstrated significant actual or potential harm and established the inadequacy of a lesser sanction.
 
 See, e.g.
 
 ,
 
 N.C. State Bar v. Livingston
 
 , --- N.C. App. ----, ----,
 
 809 S.E.2d 183
 
 , 198-99,
 
 2017 WL 6458996
 
 , at *15 (filed 19 December 2017) (No. COA17-277) (DHC's imposition of five-year suspension with opportunity to petition for stay after two years was fully supported by harm shown);
 
 Sutton
 
 , --- N.C. App. at ----,
 
 791 S.E.2d at 896
 
 (five-year suspension by DHC complied with requirements of
 
 N.C. Gen. Stat. § 84-28
 
 );
 
 N.C. State Bar v. Adams
 
 ,
 
 239 N.C. App. 489
 
 , 502,
 
 769 S.E.2d 406
 
 , 415 (2015) (DHC's findings of fact and conclusions of law adequately supported four-year suspension of defendant's license);
 
 N.C. State Bar v. Ethridge
 
 ,
 
 188 N.C. App. 653
 
 , 670,
 
 657 S.E.2d 378
 
 , 388 (2008) (DHC's conclusion of law "declaring defendant's conduct posed significant harm to his client and the legal profession has a rational basis in the evidence" and supported disbarment);
 
 N.C. State Bar v. Leonard
 
 ,
 
 178 N.C. App. 432
 
 , 446,
 
 632 S.E.2d 183
 
 , 191 (2006) (DHC's decision to disbar defendant had rational basis where "a determination that [defendant's] misconduct poses a
 
 significant
 
 potential harm to clients" was "[i]mplicit in a finding that [he] ... violated Rule 8.4(b) and (c)"),
 
 disc. review denied
 
 , --- N.C. ----,
 
 641 S.E.2d 693
 
 (2006).
 

 In the present case, the DHC's order of discipline contained findings of fact and conclusions of law explaining why it believed a five-year suspension was the appropriate sanction for Ely. Its findings of fact included the following:
 

 *671
 
 2. Defendant has not acknowledged the wrongful nature of her conduct or indicated remorse.
 

 3. By attempting to practice law in North Carolina despite not being actively licensed here, Defendant caused significant potential harm to her company's clients and to the standing of the profession in the eyes of the public because it showed her disregard for one of the foundational duties of an attorney-practicing law solely within the bounds of licensure. Such erosion of public confidence in attorneys tends to sully the reputation of, and fosters disrespect for, the profession as a whole. Confidence in the legal profession is a building block for public trust in the entire legal system.
 

 4. The Hearing Panel finds by clear, cogent, and convincing evidence any additional facts that may be contained in the conclusions regarding discipline set out below.
 

 5. The Hearing Panel has carefully considered all of the different forms of discipline available to it, including admonition, reprimand, censure, suspension, and disbarment, in considering the appropriate discipline to impose in this case.
 

 The DHC then made the following conclusions of law:
 

 1. The Hearing Panel considered all of the factors enumerated in 27 N.C.A.C. 1B § .0114(w)(1), (2) and (3) of the Rules and Regulations of the State Bar, and concludes that the following factors are applicable:
 

 27 N.C.A.C. 1B § .0114(w)(l)
 

 a. Factor (B), Intent of the defendant to commit acts where the harm or potential harm is foreseeable; and
 

 b. Factor (I), Acts of dishonesty, misrepresentation, deceit, or fabrication.
 

 27 N.C.A.C. 1B § .0114(w)(2)
 

 a. Factor (A), Acts of dishonesty, misrepresentation, deceit, or fabrication.
 

 *672
 
 27 N.C.A.C. 1B § .0114(w)(3)
 

 a. Factor (G), Multiple offenses; and
 

 b. Factor (O), Refusal to acknowledge wrongful nature of conduct.
 

 2. Although the Hearing Panel determined one of the factors under 27 N.C.A.C. 1B § .0114(w)(2) to be present, the Hearing Panel concluded that disbarment was not warranted in light of all of the circumstances of the case.
 

 3. The Hearing Panel considered all of the disciplinary options available to it and
 
 *359
 
 determined that imposition of a suspension is appropriate and necessary.
 

 4. The Hearing Panel concluded that Defendant, by unlawfully providing and offering to provide legal services to others through herself and her company, exposed the public to significant potential harm. Whenever attorneys engage in the unauthorized practice of law, there is the potential for significant harm, particularly when money exchanges hands, court appearances are made, and legal forms are drafted or filed on behalf of others. The risks of this type of arrangement include divided loyalties, fee splitting, inadequate representation, excessive fees, a lack of understanding sufficient to adequately represent and protect the interests of clients in a given jurisdiction, and criminal activity. There is also the inherent danger that someone other than a licensed North Carolina attorney will provide legal services to North Carolina citizens, thereby hampering the State Bar's ability to protect the public by regulating the practice of law in this state.
 

 5. The Hearing Panel considered all lesser sanctions and concluded that discipline short of an active suspension would not adequately protect the public. Imposition of lesser discipline would fail to acknowledge the seriousness of the offenses Defendant committed and would send the wrong message to members of the Bar and the public regarding the conduct expected of members of the Bar of this State.
 

 Based on the DHC's findings and conclusions, we cannot say that its decision to suspend Ely's license for five years exceeded its statutory
 
 *673
 
 authority. The DHC's order sufficiently linked Ely's multiple instances of improper conduct to the potential for significant harm to the public. Furthermore, the DHC expressly weighed the other disciplinary options available to it before ultimately determining that a lesser sanction would fail to adequately address the severity of her misconduct. Finally, we note that the DHC's order provides Ely with an opportunity to reduce her suspension to two years if she complies with the requirements of her administrative suspension.
 

 Thus, the DHC has established a rational basis for its decision, and Ely has failed to demonstrate that her suspension was contrary to applicable law.
 
 See
 

 Ethridge
 
 ,
 
 188 N.C. App. at 670
 
 ,
 
 657 S.E.2d at 389
 
 (DHC's findings and conclusions had rational basis in evidence to support sanction imposed);
 
 Leonard
 
 ,
 
 178 N.C. App. at 446
 
 ,
 
 632 S.E.2d at 191
 
 (DHC's decision to disbar defendant had rational basis in evidence).
 

 Conclusion
 

 For the reasons stated above, we affirm the DHC's 24 August 2016 order.
 

 AFFIRMED.
 

 Judges DILLON and INMAN concur.
 

 [1]
 

 As noted above, the email contained a hyperlink that allowed the recipient to access Palladium's website.
 

 [2]
 

 Moreover, Ely's testimony supports the proposition that although she did not personally send the email to Maupin, she approved the content of the email and authorized it to be sent.
 

 [3]
 

 Since the DHC's 24 August 2016 order, this regulation has since been removed from 27 N.C. Admin. Code 1B.0114(w) and is now contained in 27 N.C. Admin. Code 1B.0116(f).